# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

No. 03-1400

| | | |
|---|---|---|
| Jason Mages, | * | |
| | * | |
| Appellant, | * | 02 cv 347 JMR/FLN |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Minnesota. |
| Mike Johanns, Secretary, United States Department of Agriculture,* | * | |
| | * | |
| | * | |
| Appellee. | * | |

MAR 23 2006
CLERK US DIST COURT
MINNEAPOLIS MN

Submitted: June 18, 2004
Filed: December 27, 2005

Before BYE, JOHN R. GIBSON and BOWMAN, Circuit Judges.

BYE, Circuit Judge.

Jason Mages challenges a decision of the United States Department of Agriculture (USDA) requiring him to repay more than $470,000 in farm program benefits on the grounds he was not a "separate person" entitled to receive benefits and he engaged in a "scheme or device" to evade farm program requirements. We reverse and remand.

*Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Mike Johanns is automatically substituted for his predecessor, Ann Veneman, as Secretary of the Department of Agriculture and appellee in this case.

SCANNED
MAR 23 2006 JME
U.S. DISTRICT COURT MPLS

I

Jason Mages (hereinafter Jason or Mages) is a young farmer. He grew up on his parents' farm near Paynesville, Minnesota. In 1990, at age 16, Mages started his own farming operation. When he turned 18, Mages already owned his own land and farm equipment, and he cash-rented other land.[1] He obtained his own insurance and financing. He made his own planting decisions and performed his own labor. For all the years between 1992 and 1999, Mages certified on applications for farm program benefits that his farming operation was separate and distinct from any other operation and that he provided "100 %" of the "active personal management" of his farm. Between 1992 and 1999, Jason received $472,750.03 in farm program benefits.

Like many farmers do, Mages occasionally swapped labor or equipment with his parents.[2] He also entered a verbal agreement (the crop agreement) with RODI, a farm corporation established by his parents, Ron and Diane Mages. Under the crop agreement, Mages and RODI jointly purchased crop inputs such as fertilizer, herbicides, and seed to obtain large-quantity discounts. Records were kept of the purchases, with each paying a percentage of the purchase price commensurate with their share of the products. Both Mages and RODI thereby realized a reduction in input costs they could not have obtained making those purchases separately.

---

[1]Paynesville is near the intersection of Meeker, Stearns, and Kandiyohi counties. Jason farms land in all three counties and is regulated by farm service agencies in each county.

[2]The USDA's guidelines on payment limitations specifically allow for the occasional exchange of labor or equipment between farmers. Using occasional exchanges does not mean the exchanging farmers contribute to each other's farming operations for farm payment limitation purposes. Agriculture Stabilization and Conservation Service (ASCS) Handbook, 1-PL (Revision 1) ¶ 152E.

The crop agreement also pertained to the sale of the crops. Mages joined his crops with those of RODI, which in turn entered into marketing contracts with other entities. When the crops were combined in this manner, the larger volume contracts allowed both Mages and RODI to realize a higher per-bushel price for their commodities than if sold separately. The contracts were in RODI's name because Mages's father had long-term relationships with the buyers, and Mages sought to take advantage of such relationships. Because the contracts were in RODI's name, scale tickets issued by grain elevators were also in RODI's name even when the crops reflected on the tickets were Mages's crops. Similar to the joint purchases of crop inputs, Mages and RODI kept records of the crop sales and periodically settled their respective income amounts under the crop agreement – sometimes through cash payments to each other and at other times through the use of offsets of amounts owed from RODI to Mages or vice versa.

In 1993, a potential wetlands violation was identified by the USDA on farmland managed by RODI. Farming operations that commit wetlands violations are ineligible for some or all farm program benefits. 7 C.F.R. § 12.4. In addition, persons "affiliated" with wetlands violators may be ineligible for some or all farm program benefits. 7 C.F.R. § 12.8. After RODI's potential wetlands violation was identified, the USDA reviewed the status of Jason Mages's farming operation to determine whether Mages was a "separate person" under 7 C.F.R. § 1400.3 for purposes of receiving farm program benefits. At that time, the USDA determined Mages was a separate person.

Ron and Diane Mages were indicted by a federal grand jury in October 1999 with a host of offenses arising, in part, from their ownership interest in RODI and another corporation identified as GMI, Inc. The indictments included allegations the Mageses defrauded creditors in their bankruptcy proceeding by concealing their interests in RODI and GMI and defrauded the USDA by receiving farm program payments despite wetlands violations committed by one or both corporations. The

indictment also charged Jason Mages with two counts of engaging in a monetary transaction in criminally derived property in violation of 18 U.S.C. § 1957 on the grounds he had obtained significant funds from RODI. Ron and Diane were convicted by a jury who found they (but not Jason) were an alter ego for RODI and GMI. Jason contended he was innocent because the RODI payments he received were for his own crops marketed with RODI's crops under the crop agreement. He presented detailed evidence during the trial tracing all transactions between himself and RODI and establishing the legitimacy of the transactions. The jury acquitted Jason of all charges.

In November 1999, the Meeker County Farm Service Agency (FSA) initiated an investigation into the relationship between the farming operations of Ron and Diane Mages, RODI, Clem Jebb (a friend of Ron and Diane named by them as the president of RODI in corporate documents), Jason Mages, and his sister, Sara Mages. The Meeker County FSA Committee determined Jason Mages was not separate and distinct from RODI. After the Stearns County and Kandiyohi County FSA Committees made similar determinations, Jason Mages appealed the decisions to the Minnesota State Committee.

On October 26, 2000, the State Committee issued its decision. The State Committee made the following findings of fact:

> 1. Jason submitted 502 farm operating plans to FSA showing he had 100% interest in his farming operation and that he [had] no interest in any other farming operation.
>
> 2. The fact that Jason stated in the State Committee hearing that RODI had no written agreement with Jason to market his grain and in fact received no monetary compensation for marketing his grain.
>
> 3. A statement from Wayne Fridgon (sic) Crop Insurance adjuster in which Wayne say's (sic) Jason told him RODI was his farm name.

4. A statement from Victor Bruer, Crop Insurance loss adjuster in which Victor say's (sic) RODI scale tickets were presented to him as tickets from all three Mage's (sic) farming operations.

5. The fact that Jason had used RODI scale tickets to claim and receive crop insurance indemnities on his farm.

6. Testimony showing that RODI actually contracted Jason's beans. An action which made RODI liable for delivery of beans producer (sic) on Jason's farm.

7. The fact that RODI shared in the proceeds from Jason's farming operation as evidenced by checks issued to RODI from the sale of crops grown on Jason's farm.

8. The fact that court records show that from 1993 to 1999, 60-62% of the monies paid out by RODI, went to Jason Mages.

9. The fact that Jason amended a grain contract for RODI and signed the contract RODI Inc. by Jason Mages.

10. The fact that RODI claimed proceeds from the sale of his beans as taxable income for RODI.

11. RODI paid Jason's debts as evidenced by testimony from Larry Serbus, manager Klein Burger Co., Bird Island MN.

12. The fact that Clem Jeb (sic), who had been granted immunity from prosecution if he told the truth, stated that he had never talked to Jason about RODI, while Jason said he talked directly to Clem about issues dealing with RODI.

Appellee's App. at 206.

Based on these fact findings, the State Committee concluded:

> Jason Mages did not meet the criteria to be considered a person separate and distinct from any other producer. Jason's farming operation does not meet the commensurate share rule. Jason is ineligible from FSA program payments from 1992 through 2000. In addition the State Committee determined that Jason had many opportunities to disclose the information concerning his relationship to RODI. His failure to do so prevented the County Committee's (sic) from making proper eligibility determinations. As a result the State Committee determined that Jason had participated in a scheme to earn payments he was not entitled to from 1992 through 2000.[3]

Id. at 207.

Jason appealed the State Committee's decision to the USDA's National Appeal Division (NAD). On January 23, 2001, after an informal hearing, the NAD Hearing Officer made the following findings of fact:

> 1. The Appellant has participated in USDA programs since 1992 as a separate person, eligible for maximum benefits under program payment limitations. From 1992 through 1999 he collected $472,750.03 in program benefits subject to payment limitations.
>
> 2. From 1992 through 1999, the Appellant identified and certified himself as a separate person for USDA program purposes. He identified farms that he owned and rented. His farm plan and annual updates show that he contributed 100% of the labor and management including marketing. He indicated that he had read and understood regulations regarding the designation of a separate person.

---

[3]Mages moved to file a supplemental brief and appendix contending the two references in this paragraph to the year 2000 are erroneous, and in fact the disputed years are 1992 through 1999. We agree. We therefore grant Mages's motion and conclude the dispute in this case is limited to the years 1992 through 1999.

> 3. RODI, Inc. is a separate farming entity that was managed by the Appellant's father. The Appellant's mother was the bookkeeper. In 1993 a potential wetland violation was identified on RODI managed land. This led to a review of the Appellant's status as a separate person because of USDA benefits. This review ended with a determination that Appellant was a separate person.
>
> 4. A USDA Office of Inspector General (OIG) review of RODI found that between 1993 and 1999 nearly 62% of RODI proceeds totaling $1,066,869.16 went to the Appellant. These proceeds were mainly from the marketing of his crops through RODI contracts.
>
> 5. In 1995 and 1997, the Appellant documented crop losses for insurance purposes using RODI scale tickets. He was subsequently paid crop insurance indemnities based on them.
>
> 6. In 1996, the Appellant paid a personal debt to the Klein-Berger Company using RODI navy beans.
>
> 7. From 1996-1999 RODI had wetland violations on land that were (sic) corporately controlled.

Id. at 213.

Based on these fact findings, the NAD Hearing Officer made the following pertinent conclusions:

> The regulations require a separate and distinct interest in crops, separate responsibility, and separate accounts from that of any other entity. The Appellant's relationship with RODI violates theses regulations because the Appellant's interest in the crops through this informal arrangement fails the separate and distinct test. The Agency correctly determines that the Appellant was not a separate person for USDA programs from 1993-1999.
>
> . . .

> RODI contracts were used to market the Appellant's commodities. Therefore RODI had a contribution to and an interest in the Appellant's farming operation that was at risk, namely default of these marketing contracts. The Appellant was under no written obligation to provide the crops for the contracts.
>
> . . .
>
> The role that RODI played in marketing the Appellant's grain established an interest in the Appellant's operation. If the Agency had known of this arrangement, RODI would have been due a portion of the Appellant's benefits under the commensurate share rule. Because RODI had an interest in the Appellant's commodities, the Agency correctly concludes that the Appellant was not a separate person for USDA benefits.
>
> . . .
>
> RODI is an entity that has been in violation of wetland provisions and therefore ineligible for USDA benefits. Completely revealing the Appellant's relationship with RODI could result in his ineligibility for USDA programs. The Agency correctly concludes that not revealing this relationship is a scheme or device that if not designed (sic) [disclosed], has the effect of evading the correct determination of the Appellant's operation.
>
> . . .
>
> The Agency's decision that the Appellant was not a separate person for USDA program purposes and that he participated in a scheme or device was not erroneous.

Id. at 215-16.

Mages made a timely request to have the NAD Hearing Officer's decision reviewed by the Director of the NAD. On April 5, 2001, the NAD issued a Director Review Determination adverse to Mages. Focusing on the same facts identified by the State Committee and the NAD Hearing Officer, the Director Review made the following pertinent conclusions:

> [T]he Appellant's crops were marketed under RODI, Inc. contracts and the proceeds were paid directly to RODI, Inc. The Appellant used

> RODI, Inc. scale tickets to claim and receive crop insurance payments. The Appellant has not shown a separate and distinct interest in the crops produced nor a separate responsibility for such. Substantial evidence supports the Hearing Officer's determination that the Agency did not err in determining that the Appellant was not a person separate and distinct from any other individual or entity.
>
> . . .
>
> The Appellant certified himself as a person, separate and distinct from other individuals and entities and concealed the interest that RODI, Inc. had in his farming operation. Substantial evidence supports the Hearing Officer's determination that the Agency did not err in its decision that the Appellant participated with RODI, Inc. in a scheme or device to avoid payment limitation provisions and received payments to which he was not entitled.

Appellant's App. at 570-71.

In accordance with the provisions of the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706, Mages filed an action in federal district court requesting review of the final agency decision. Following a hearing on cross motions for summary judgment, the district court upheld the agency decision. Mages filed a timely appeal with this court.

On appeal, Mages does not challenge the USDA's factual findings. Instead, Mages challenges whether the USDA properly concluded he did not have a "separate and distinct" interest in his farming operation and therefore was not eligible to participate in USDA farm programs as a "separate person," and whether the USDA properly concluded he engaged in a scheme or device to evade the farm program requirements.

II

"When reviewing the district court's opinion upholding the administrative agency's decision, this court must render an independent decision on the basis of the same administrative record as that before the district court." United States v. Massey, 380 F.3d 437, 440 (8th Cir. 2004) (citing Moore v. Custis, 736 F.2d 1260, 1262 (8th Cir.1984)). We will set aside an agency's decision if it "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "[W]e accord substantial deference to an agency's interpretation of its own regulation . . . unless the interpretation is plainly erroneous or inconsistent with the regulation." South Dakota v. United States Dep't of Interior, 423 F.3d 790, 799 (8th Cir. 2005) (internal citations and quotations omitted).

A. Separate and Distinct Interest

First, Mages challenges the USDA's determination he did not have a "separate and distinct" interest in his own farming operation.

To be considered a "separate person" eligible for farm program payments, an individual or entity must, in part, "[h]ave a separate and distinct interest in the land or the crop involved." 7 C.F.R. § 1400.3.[4] The USDA determined Mages did not have a "separate and distinct interest" and thus was not a "separate person" after concluding RODI had an interest in Mages's crops arising from the crop agreement. Mages disputes RODI had any interest in his crops. In the alternative, he contends he

---

[4]A person must also be "actively engaged in farming" to qualify for farm program benefits. 7 C.F.R. § 1400.201(a). This is to prevent passive investors from receiving farm program payments. See Christopher R. Kelley, Introduction to Fed. Farm Program Payment Legislation and Payment Eligibility Law, Ark. L. Notes 11, 17 (2002). There is no dispute Mages was actively engaged in farming.

satisfied the "separate and distinct interest" test even assuming RODI had an interest in his crops.

To satisfy the "separate and distinct interest" test, Mages need only have had an interest "in the land ***or*** the crop involved." 7 C.F.R. § 1400.3 (emphasis supplied). Mages had a separate and distinct interest in the land involved in his farming operation. Mages owned his farmland or cash-rented it. There is no evidence RODI had an interest in Mages's land. Thus, even assuming RODI had an interest in the crops grown on the land – an issue we need not address for purposes of resolving Mages's "separate person" status – nothing in the pertinent regulations indicates RODI's alleged crop interest somehow negates Mages's separate and distinct interest in the land. The USDA's decision is flawed because it required Mages to show a separate and distinct interest in his land ***and*** crops, notwithstanding the disjunctive nature of the regulation.[5] The USDA's decision on this issue is plainly inconsistent with the regulation and therefore cannot stand.

In addition to its determination Mages failed the "separate and distinct" interest test because RODI had an interest in his crops, the USDA also seems to have implicitly, if not expressly, found Mages had an interest in RODI and therefore failed the "separate and distinct" interest test for that reason. Even assuming Mages had some interest in RODI – an issue we need not address for purposes of resolving Mages's "separate person" status – merely having an interest in another farming

[5]On appeal, the government actually relies upon the disjunctive nature of the regulation, but argues erroneously it was enough for the USDA to show RODI had an interest in Mages's land ***or*** crops. Under the regulations as written, that inquiry may be relevant to determining RODI's status as a farming operation, but it is wholly irrelevant to determining Mages's "separate person" status. The proper inquiry for determining Mages's status as a "separate person" is necessarily limited to whether he had a "separate and distinct" interest in his land or crops.

operation did not negate Mages's "separate person" status given Mages's separate and distinct interest in his own farmland.[6]

B. Scheme or Device

Next, Mages challenges the USDA's decision he engaged in a "scheme or device" to evade payment limitations under the farm program. Farm payments may be withheld or required to be refunded if a person "adopts or participates in adopting a scheme or device designed to evade this part [i.e., the farm program] or that has the effect of evading this part." 7 C.F.R. § 1400.5. The regulation further provides participation in a scheme or device includes "[c]oncealing information that affects the application of this part [or] [s]ubmitting false or erroneous information." Id.[7]

The agency determined Mages participated in a "scheme or device" for three reasons. First, the USDA determined Mages engaged in a scheme or device by applying for farm program payments as a "separate person." Because the USDA wrongly concluded Mages did not have a separate and distinct interest in his farming

---

[6]Indeed, as we explain below in our discussion of the commensurate share rule, the farm program regulations specifically contemplate farming operations having interests in other farming operations. When such is the case, the interest must be disclosed, but does not necessarily negate an individual's "separate person" status for the purpose of applying for farm program payments.

[7]The regulation essentially tracks the requirement of 7 U.S.C. § 1308-2, which provides:

> If the Secretary of Agriculture determines that any person has adopted a scheme or device to evade, or that has the purpose of evading [the farm program], such person shall be ineligible to receive farm program payments . . . applicable to the crop year for which such scheme or device was adopted and the succeeding crop year.

operation, it follows he did not engage in a "scheme or device" merely by applying for farm program payments as a separate person.

The last two reasons given in support of the "scheme or device" determination focus primarily on Mages's crop agreement with RODI. First, the USDA concluded RODI had an interest in Mages's crops because of the crop agreement and the nondisclosure of the interest violated the commensurate share rule under 7 C.F.R. § 1400.6. Second, the USDA seems to have concluded in the alternative Mages had an interest in RODI, and the nondisclosure of this interest prevented the agency from making a correct determination about whether Mages was ineligible for farm programs as an "affiliated person" of a wetlands violator under 7 C.F.R. § 12.8. We address each of these conclusions in turn.

1) The Commensurate Share Rule

The commensurate share rule requires an individual or entity to have both a "share of the profits or losses from the farming operation that is commensurate with the individual's or entity's contribution to the operation," and "[c]ontributions to the farming operation that are at risk" in order to be considered eligible for farm program payments. 7 C.F.R. § 1400.6 (a) & (b). In accord with this commensurate share rule, farm program payments are made to those entities or individuals (who are actively engaged in farming) with interests in a farming operation according to those respective interests.

In other words, if RODI had a contribution to Jason Mages's farming operation that was at risk (and RODI was otherwise eligible to participate in the farm program) RODI would have been due a portion of Mages's farm program payments. But if RODI was not eligible to participate in the farm program, no one, including Mages, would have been entitled to receive the portion of the farm program payments which corresponded to RODI's "at risk" contribution. The USDA contends Mages violated

the commensurate share rule by receiving farm program payments which corresponded to RODI's contribution to Mages's farming operation, and since RODI was ineligible to receive farm program payments as a wetlands violator, no one should have received the farm program payment attributable to RODI's interest in Mages's farming operation.

Application of the commensurate share rule to the crop agreement between RODI and Mages necessarily turns on whether RODI had a contribution to Mages's farming operation that was "at risk." Id. at § 1400.6(b). "[N]either the statute nor the regulations define the phrase 'at risk.' Presumably, it is used in its ordinary sense and means that a contribution must be a true economic investment in the farming operation. Such an investment carries with it the potential for personal gain or loss in accordance with the performance of the farming operation." Christopher R. Kelley & Alan R. Malaskey, Federal Farm Program Payment-Limitations Law: A Lawyer's Guide, 17 Wm. Mitchell L. Rev. 199, 255 (1991).

In the agency proceedings, the only reason given by the USDA to support the conclusion RODI had an "at risk" contribution to Mages's farming operation was:

> RODI contracts were used to market the Appellant's commodities. Therefore RODI had a contribution to and an interest in the Appellant's farming operation that was at risk, namely default on these marketing contracts. The Appellant was under no written obligation to provide the crops for the contracts.

Appellee's App. at 215. Thus, the USDA concluded RODI had an "at risk" contribution to Mages's farming operation because, without a written agreement, RODI had no remedy if Mages failed to provide crops for RODI's contracts.

The USDA's conclusion, which turns on whether the crop agreement was in writing, is not legally sound. The contract between RODI and Mages did not have to

be in writing to be enforceable. See McArdle v. Williams, 258 N.W. 818, 820 (Minn. 1935) (indicating oral contracts are generally valid and enforceable under Minnesota law); see also Eklund v. Vincent Brass and Aluminum Co., 351 N.W.2d 371, 375 (Minn. Ct. App. 1984) (quoting Rowe v. Noren Pattern and Foundry Co., 283 N.W.2d 713, 715 (Mich. Ct. App. 1979) ("Where an oral contract may be completed in less than a year, even though it is clear that in all probability the contract will extend for a period of years, the statute of frauds is not violated.")).

Neither Mages nor RODI, nor the USDA for that matter, dispute the existence of an agreement between RODI and Mages. If Mages had breached the crop agreement by failing to provide RODI sufficient crops to satisfy its marketing contracts, RODI would be entitled to sue Mages for breach of contract. RODI's alleged contribution to Mages's farming operation via the crop marketing agreement was not "at risk," therefore, because Mages had a contractual duty to provide the crops and RODI had a contractual remedy if Mages breached. RODI did not have a true economic investment in Mages's farming operation because its interests were merely contractual in nature. The USDA's conclusion the lack of a *written* agreement placed RODI's contribution at risk is "not in accordance with law," 5 U.S.C. § 706(2)(A), and therefore cannot stand.

Because RODI did not have a contribution to Mages's farming operation that was "at risk," it follows Mages did not violate the commensurate share rule, or engage in a scheme or device, by failing to disclose the existence of the crop agreement with RODI.[8]

---

[8]In addition, the USDA's implicit finding Mages had an interest in RODI (as opposed to RODI's alleged interest in Mages) cannot support the conclusion Mages violated the commensurate share rule through *his* applications for farm program payments. Such a finding (assuming Mages's alleged interest in RODI was "at risk") could only support a claim RODI violated the commensurate share rule through *its* applications for farm program payments, if RODI's applications were at issue, which they are not.

2) Affiliated Person of a Wetlands Violator

As we have noted, the USDA's factual findings also seem to indicate the agency found Mages had an interest in RODI. As we also noted, such a finding does not support the conclusion Mages was not a "separate person" entitled to apply for farm program payments, nor does it support a conclusion Mages violated the commensurate share rule. Such an interest could, however, support the conclusion Mages was an "affiliated person" of a wetlands violator under 7 C.F.R. § 12.8, if Mages's alleged interest in RODI meets the requirements of § 12.8.

The USDA never actually determined Mages was an "affiliated person" of a wetlands violator. Instead, after noting both § 12.8 and RODI's status as a wetlands violator, the agency concluded "[c]ompletely revealing the Appellant's relationship with RODI *could result* in his ineligibility for USDA programs." Appellee's App. at 216 (emphasis supplied).

At the outset, we hold the USDA's conclusion Mages engaged in a scheme or device merely on the grounds his disclosure of an interest in RODI *could result* in ineligibility is arbitrary and capricious. The USDA's scheme or device determination depends upon Mages having submitted "false or erroneous information." 7 C.F.R. § 1400.5. If, in fact, Mages's interest in RODI (if any) does not meet the requirements of an "affiliated person" under 7 C.F.R. § 12.8, then it follows he did not submit false or erroneous information by not revealing the interest and the USDA's scheme or device determination cannot stand. We therefore review the USDA's findings to determine whether Mages actually had an interest in RODI, the disclosure of which *would result* in his ineligibility for farm program payments.

Subsections (b) and (c) of 7 C.F.R. § 12.8 divide "affiliated persons" of a wetlands violator into two categories depending upon whether the wetlands violator was a "person" or an "entity." In this case, the wetlands violator was RODI, a corporation, and thus Mages had to be an affiliated person of a corporation to be

considered ineligible for farm program payments. Under the regulation, only shareholders holding more than twenty percent of the shares of a corporation are "affiliated persons" of a wetlands violator. 7 C.F.R. § 12.8(c). The administrative record contains no evidence indicating Mages held any shares in RODI. In an abundance of caution, however, we will address the USDA's factual findings to determine whether they support the implied conclusion RODI was, in essence, an alter ego not only of Mages's parents, Ron and Diane, but also of Mages himself.

a) The crop agreement fact findings

Most of the USDA's factual findings focus on the crop agreement between RODI and Mages, and certain consequences of the crop agreement in Mages's dealings with third parties. Specifically, the USDA found:

> 1) The crop agreement was not in writing and RODI received no monetary compensation from Mages for the crop agreement;
>
> 2) RODI scale tickets were presented to a crop insurance adjuster as tickets for both RODI's and Mages's farming operations, and Mages used RODI scale tickets to claim and receive crop insurance indemnities;
>
> 3) RODI contracted Mages's beans, making RODI liable for delivery of beans produced on Mages's farms;
>
> 4) RODI paid Mages's debts with the Klein Burger Company; and
>
> 5) From 1993 to 1999, as much as 62% of the monies paid out by RODI went to Mages.

Appellee's App. at 206. None of these factual findings support the implied conclusions Mages had an interest in RODI or RODI was an alter ego for Mages.

The fact the crop agreement was not written does not mean it was invalid or unenforceable. Nor is it significant RODI did not receive a set monetary fee. Although Mages does not challenge the USDA's factual finding that RODI received

no monetary benefit for the crop agreement, the factual finding is clearly erroneous. RODI received a monetary benefit as a result of the crop agreement because Mages's crops increased the volume of the marketing contracts entered into by RODI, giving RODI the benefit of a higher per-bushel price for its own commodities. Thus, the contract was supported by mutual consideration. The mere fact an individual enters a valid and enforceable contract with a corporation does not give the individual an interest in the corporation, nor make the corporation his alter ego.

Next, Mages's use of RODI scale tickets to claim and receive crop insurance indemnities does not support a conclusion Mages had an interest in RODI. The evidence presented by Mages in the administrative record demonstrates RODI scale tickets were presented to a crop insurance adjuster and used by Mages to claim and receive crop insurance indemnities because the crop reflected on the scale tickets was Mages's crop, grown on his land. The scale tickets issued by grain elevators were in RODI's name simply because the contracts were in RODI's name. That fact says nothing about whether Mages had an interest in RODI, but it is simply a logical and expected consequence of the manner in which grain elevators conduct their business. The record demonstrates "it is permissible to use sales receipts in another's name [to claim crop insurance indemnities] as long as the production actually came from the unit it is being applied to." Appellant's App. at 218 (Statement of Insurance Agent Bruce Tengwall).

Next, the factual findings that RODI contracted Mages's beans and paid Mages's debt with the Klein Burger Company do not support a conclusion Mages had an interest in RODI. The fact RODI contracted Mages's beans was the very purpose of the crop agreement, which we have already indicated was a valid and enforceable contract between two separate entities supported by mutual consideration. And while the record demonstrates a seed debt was paid with marketing proceeds from a RODI contract, the record also reflects the payment was ultimately offset by the proceeds of navy beans produced by Mages, since RODI withheld a corresponding amount of money from a navy bean settlement between itself and Mages. Id. at 23. Saying the

seed debt was paid by RODI rather than Mages is a mischaracterization of the record. Also included in the administrative record was the detailed evidence presented by Mages in the criminal trial tracing each of his transactions with RODI, which demonstrates each party to the crop agreement paid a commensurate share of the purchases and received a commensurate share of the income. Appellee's App. at 467-82.

Finally, the fact that as much as sixty-two percent of the monies paid out by RODI went to Mages between 1993 and 1999 does not support a conclusion Mages had an interest in RODI. The record shows RODI paid Mages sixty-two percent of its income because Mages's crops comprised that same percentage of the joint marketing contracts. The mere fact a corporation does the majority of its contracting and business with one particular entity does not support the conclusion the entity obtains an interest in the corporation.

b) The Wayne Fridgen statement

The administrative record contains a memorandum of an interview of Wayne Fridgen, a crop insurance adjuster from Alexandria, Minnesota, conducted by two USDA investigators. Id. at 121-22. In the memorandum, the agent who prepared the memorandum (the record does not reflect which) says Fridgen told him "JASON MAGES told him RODI was his farm name and the bean production belonged to him." Id. at 122. This statement was made in the context of Mages using RODI scale tickets to claim and receive crop insurance indemnities.

Bruce Tengwall, Mages's insurance agent, was present during the conversation between Fridgen and Mages. Tengwall filed a statement indicating "[t]o the best of my knowledge, [Mages] never indicated to me or anyone in my presence that he was part of RODI, Inc. He did market his edible beans through RODI, Inc." Id. at 418. The administrative record also contains grand jury testimony from Bruce Tengwall, who testified under oath:

Q. And you've never been told that RODI, Inc. is the Mageses' family farm?

A. No.

Q. You've never been in the presence of Ron, Diane or Jason Mages telling someone that that is their family farm?

A. No, not to my knowledge.

Id. at 424.

Setting aside the fact the USDA gave its investigator's memorandum – which arguably constituted triple hearsay – more weight than it accorded the direct and sworn statements of Tengwall, it is still clear Mages's statement would be insufficient to support a conclusion Mages had an interest in RODI. Even assuming Mages made the statement, he made it in the context of explaining why a crop loss on a crop grown by him on his own land would be reflected by a scale ticket issued in RODI's name. As discussed above, the fact grain elevators issued scale tickets in RODI's name because the contracts were in RODI's name says nothing about whether Mages had an interest in RODI, but is simply a logical and expected consequence of the manner in which grain elevators conduct their business.

c) Amendment of grain contract

The USDA found Mages "amended a grain contract for RODI and signed the contract RODI Inc. by Jason Mages." Id. at 206. In the administrative proceedings, Mages's counsel explained Cargill allowed a delivery extension on a RODI grain contract due to inclement weather. Mages signed the extension at the request of Cargill, and on behalf of RODI, because Ron Mages was on vacation and Jason Mages happened to be the one hauling grain for RODI on that particular day. Id. at 234. On appeal, Mages contends this act did not give him an interest in RODI because he merely acted as RODI's agent. We agree. Acting as an agent on behalf of a corporate

principal, in and of itself, does not give the agent an ownership interest in the corporation.

d) RODI reporting Mages's crop as its taxable income

The USDA found "RODI claimed proceeds from the sale of [Mages's] beans as taxable income for RODI." Id. at 206. We would be suspicious of this fact in determining whether Mages had an interest in RODI, were it not for the fact the record also shows Mages paid income taxes on all crop sales attributable to him and he was not involved in RODI's tax preparation.

e) Clem Jebb statement

The USDA found Clem Jebb (the person Ron and Diane Mages fraudulently identified as the president of RODI) "stated that he had never talked to Jason about RODI, while Jason said he talked directly to Clem about issues dealing with RODI." Id. at 206. Although Mages does not challenge the USDA's fact findings on appeal, we can find no support in the administrative record for the finding that "Jason said he talked directly to Clem about issues dealing with RODI." This finding is based upon an excerpt from the criminal trial against Mages's parents, in which Mages said:

> Q. If you didn't feel like selling your beans, RODI assumed the risk, correct?
>
> A. The risk of what?
>
> Q. Of not being able to fulfill the contract because you didn't – you got a better price elsewhere.
>
> A. Well, I had a trust with Clem. That would never have happened.
>
> Q. You didn't talk to Clem Jebb about this contract?

A. Clem knew about that before it was ever made.

Id. at 116.

The trial excerpt does not indicate Jason said he talked directly to Clem Jebb. The excerpt indicates Jason "had a trust with Clem" and "Clem knew" about the RODI/Mages crop agreement before it was ever made. Both Jason's "trust" and Jebb's knowledge of the crop agreement could have been obtained via Ron Mages, Jason's father. More importantly, we fail to see how Clem Jebb and Jason Mages making contradictory statements about whether they discussed issues dealing with RODI is relevant to showing Mages had an interest in RODI. At most, Mages's testimony shows he was aware of his parents' designation of Clem Jebb as RODI's president. Thus, even assuming Mages was further aware the designation was tainted with fraud, his trial testimony merely shows he may have been reluctant to betray his parents at their criminal trial. His parents' fraud, however, does not prove Mages himself had an interest in RODI, and the marginal (if any) relevance of this evidence is further undermined by the fact the jury acquitted Mages of any wrongdoing in his parents' criminal trial.

In sum, none of the USDA's findings support the implied conclusion RODI was, in essence, an alter ego not only of Mages's parents, but also of Mages himself. Instead, the evidence in the administrative record overwhelmingly supports the parallel conclusion reached by the jury in the criminal trial against Mages's parents, that is, Ron and Diane Mages were an alter ego for RODI and GMI, but not Jason. There is no support in the administrative record for concluding Jason Mages should also bear responsibility for his parents' fraud.

III

Finally, we comment on two issues raised on appeal not addressed in the administrative proceedings. On appeal, the government urges us to affirm the

agency's decision because the USDA regulations define "active personal management" to include the "[m]arketing and promotion of agricultural commodities produced by the farming operation." 7 C.F.R. § 1400.3. Based on this definition of "active personal management," the government further contends RODI contributed a percentage of the "active personal management" of Mages's farming operation by marketing Mages's crops through the crop agreement, and Mages therefore submitted false information on his farm program applications when he represented he provided "100 %" of the "active personal management" of his farm.

We decline to address this argument on appeal. See Mayo v. Schiltgen, 921 F.2d 177, 179 (8th Cir. 1990) ("[A] reviewing court may not uphold an agency decision based on reasons not articulated by the agency itself in its decision. . . . A court must consider the agency's rationale for its decision, and if that rationale is inadequate or improper the court must reverse and remand for the agency to consider whether to pursue a new rationale for its decision or perhaps to change its decision."); but see HealthEast Bethesda Lutheran Hosp. & Rehab. Ctr. v. Shalala, 164 F.3d 415, 418 (8th Cir. 1998) (suggesting Mayo's holding should be limited to those instances "in which an agency fails to make a necessary determination of fact or policy."). The administrative record in this case is insufficient for us to glean from it the USDA's policy on whether a farmer participating in a crop agreement of the type between Mages and RODI must attribute a percentage of his "active personal management" to the agreement.[9]

---

[9]We note, however, the USDA's regulations exempt a "cooperative association of producers that markets commodities for producers" from being considered a "person with respect to the commodities so marketed for producers." 7 C.F.R. 1400.3, Person (4). If the RODI/Mages crop agreement (which Mages represents included other farmers besides RODI and Mages) qualifies as a "cooperative association of producers" we do not believe Mages would be required to attribute a percentage of his active personal management to RODI.

In addition, "active personal management" is "defined to exclude hired services." Kelley, Intro. to Fed. Farm Program Payment Legislation, 2002 Ark. L.

On remand, both parties are free to fully develop and address the question whether Mages was required to attribute a percentage of his "active personal management" to RODI due to the crop agreement, and if so, the consequences of his failure to do so.

Mages also raises an issue on appeal not addressed in the administrative proceedings. Mages contends the penalties for engaging in a "scheme or device" under 7 C.F.R. § 1400.5 are quasi-criminal in nature, and thus the USDA cannot determine a person engaged in a "scheme or device" without first finding the person intended to defraud the government. Because we have resolved this appeal in favor of Mages, we need not reach this issue. Should the USDA determine on remand, however, that Mages was required to attribute a percentage of his "active personal management" to RODI because of the crop agreement, Mages is certainly free to raise this issue before the agency.

---

Notes at 29. As we indicated previously, although RODI did not receive a set fee from Mages as a result of the crop agreement, RODI did receive compensation in the form of higher per-bushel prices for its own products.

Finally, at least two USDA publications suggest marketing agreements of the type entered into between RODI and Mages do not diminish the farmer's personal management responsibility:

> Marketing contracts refer to verbal or written agreements between the farmer (contractee) and the buyer (contractor) generally a processing and/or marketing company that set a price (or pricing mechanism) and determine an outlet for a specified quantity of a commodity. Most management decisions remain with the farmer, who retains ownership during the production cycle. The farmer assumes all risks of production, but shares price risk with the contractor.

USDA, Nat'l Agric. Statistics Serv., Corn, Soybeans, & Wheat Sold Through Marketing Contracts 2001 Summary, at 2 (Feb. 2003); see also Econ. Research Serv./USDA, Farmers Use of Marketing & Prod. Contracts, at 3 (1997) (same).

IV

For the reasons discussed, we reverse the judgment of the district court. We remand this case to the district court with instructions to remand this case to the USDA for further proceedings consistent with this opinion.

---

A TRUE COPY OF THE ORIGINAL
MICHAEL E. GANS, CLERK
UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT
BY: Michael E. Gans